USCA1 Opinion

 

 September 23, 1992 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ___________________ No. 92-1460 CARMEN TORRES, Plaintiff, Appellant, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee. __________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, Jr., U.S. District Judge] ___________________ ___________________ Before Torruella, Cyr and Stahl, Circuit Judges. ______________ ___________________ Salvador Medina De La Cruz on brief for appellant. __________________________ Daniel F. Lopez Romo, United States Attorney, Jose Vazquez _____________________ ____________ Garcia, Assistant United States Attorney, and Nancy B. Salafia, ______ ________________ Assistant Regional Counsel, Dept. of Health & Human Services, on brief for appellee. __________________ __________________ Per Curiam. Claimant contends she is disabled due to __________ fibromyositis, muscle spasm, and thoracic outlet syndrome. The secretary disagreed, concluding that while claimant could not return to her former secretarial work, she could do certain sedentary jobs identified by a vocational expert in response to a hypothetical question and consequently was not entitled to disability benefits. Claimant contends that the decision denying benefits was faulty in three main respects. First, the ALJ impermissibly interpreted raw medical data without any expert medical assistance to assess claimant's residual functional capacity (RFC). Second, the RFC the ALJ arrived at is not supported by substantial evidence and failed adequately to consider claimant's subjective complaints. Third, the ALJ concluded claimant could not use her hands repeatedly for fine manipulation, but failed to include this limitation in the hypothetical posed to the VE. Consequently, the VE's testimony can not serve as substantial evidence to support the denial of benefits, claimant maintains. We review the evidence and then turn to claimant's arguments. I. Claimant worked as a secretary until October 1987 when, she claims, the pain in her neck, arms, and back prevented her from continuing. -2- The first medical report is from Dr. Kindy, an orthopedic surgeon, who examined claimant in January 1988 and reported his results to claimant's employer's insurance carrier. Claimant complained of numbness in both trapezii and pain in the arms, neck, back and legs. The pain had persisted, worsening, for over a year. Range of motion of the cervical and lumbar back was complete with "moderate discomfort," and range of motion of the extremities was complete with "minimal stiffness." Dr. Kindy recommended evaluation by a neurologist and said claimant could then return to work. Claimant saw a neurologist, Dr. Ramirez Vincenty, the next month. In addition to the complaints reported to Dr. Kindy, Dr. Ramirez noted complaints of paresthesia (abnormal sensation) of the limbs and arm weariness resulting in frequently dropping things. Dr. Ramirez reported normal gait, no difficulty sitting or standing, and no motor, sensory, or cerebellar abnormalities. He noted hardening and tenderness of cervical and shoulder girdle muscles, and tenderness to pressure at thoracic spine, but without limitation of motion. His impression was "chance[] of fibromyositis contemplated," and he projected a "good" prognosis. Beginning in April 1988, claimant began physical therapy with Dr. Garcia and physiatrist Dr. Martinez Deliz. The -3- first report (4/12/88) noted x-ray evidence of neck muscle spasm and straighted cervical spine, but found full range of motion, though with tenderness. The diagnosis was cervical thoracic myositis. The next notation (4/26/88) reported claimant's complaints of foot pain and swelling due to bilateral posterior spurs. In May, claimant was "improving slowly" with therapy. "Moderate tenderness" continued in the neck. On May 24, 1988, Dr. Garcia executed a return to work certificate stating claimant could resume work on May 30, 1988. In August 1988, Dr. Martinez conducted an EMG study and reported bilateral thoracic outlet syndrome. Dr. Garcia referred claimant to Dr. Acosta, who began treating claimant in late May 1988. Dr. Acosta noted cervical and lumbar joint pain, morning stiffness in neck and shoulders, limitation of flexion-extension in lumbar zone, hypoesthesia (abnormally decreased sensitivity to stimulation) of both hands with paresthesia (abnormal sensation such as tingling), respiratory difficulty upon minimal exertion, and edema of both ankles. He diagnosed "rheumatism-rheumatic fibromyalgia" and prescribed muscle relaxants (flexeril) and other medications. On May 26, 1988, about the time Dr. Garcia said claimant could return to work, Dr. Acosta filled out a similar return to work certificate, but projected the return date to be July 15, 1988 in view of severe back muscle spasm and fibromyalgia. -4- In May 1988, claimant filled out a disability report form. Questioned about her ability to do household chores, claimant said she did work at home as she had three children to care for and no one to help her, but the effort caused great pain. The only household task she said she could not do was ironing. She drove in emergencies at the time. Dr. Acosta saw claimant monthly. His progress notes are largely illegible, but notations of hand numbness in June 1988 and spasm in August and September 1988 are discernible. Dr. Carreras examined claimant in August 1988. Gait was normal. Motor, sensory, and cerebellar systems were intact. A test for thoracic outlet syndrome was positive. Moderate tenderness to palpation of the right neck muscles and trapezius muscle was noted. Dr. Carreras's impression was "postural cervical myositis [muscle inflammation] with secondary bilateral thoracic outlet syndrome" and "mild chronic lumbar strain." In September 1988, Dr. Acosta (the treating physician) filled out an "Attending Physician's Statement of Disability" supplied by claimant's employer's insurance carrier covering the four month period May 1988 through September 1988. His diagnosis was bilateral thoracic outlet syndrome, fibromyalgia, and back muscle spasm. He stated claimant had "very much" improved during that period, and he projected -5- that claimant could return to part-time light work (but not her secretarial job) by the end of November 1988. After examining the reports of Dr. Acosta, Dr. Martinez Deliz, and Dr. Carreras, a non-examining doctor concluded that none of claimant's conditions severely limited claimant's ability to perform basic work duties and that consequently claimant was not disabled. In November, claimant completed another disability form. She said that her neck was stiff, arm movement was limited, and she could not keep her arms in a raised position and hence could not hang her clothes. Also, she could not perform activities requiring her to lower her head, such as reading or washing dishes, because her muscles would become very stiff. She said her doctor had advised her to avoid stress and strenuous exercise. Dr. Acosta continued treating claimant. The progress notes are again largely illegible, but mild shortness of breath was noted in October and muscle spasm in November. In December 1988 spasm was "minimal." After reviewing the earlier reports plus these additional progress notes from Dr. Acosta, a second non- examining doctor concluded that claimant had no severe loss of movement, sensation, or reflexes and was not disabled. -6- Dr. Justiniano conducted an arterial study of the upper extremities in November 1988. His impression was bilateral mild obstructive disease of ulnar and radial arteries. The last medical report is from Dr. Bonilla Torres, a neurologist, who examined claimant in May 1989. Claimant complained of tension in the nape of the neck, tiredness and numbness of both arms, hand tremor, loss of hand strength, loss of finger dexterity, chest pain, and occasional dizzy spells. Dr. Bonilla noted diminution of grasp both hands, pain at pressure over both trapezii, pain in muscles upon counter movements of the neck, and pain and numbness of the arms upon hyperabduction of the arms. His impression was bilateral thoracic outlet syndrome and myofascial syndrome, both trapezii. The ALJ accepted the doctors' diagnoses of thoracic outlet syndrome and myofascial syndrome. He concluded claimant "should avoid the repeated use of hands for fine movements" and raising arms above shoulder level, but that she retained the residual functional capacity (RFC) for the segment of unskilled sedentary work which would not require those arm and hand movements and would allow claimant to alternate positions. Based on the vocational expert's testimony, the ALJ concluded claimant could perform the jobs of table worker, label picker, and tester. II. -7- A. No doctor (either examining or non-examining) completed an RFC form checking off how much weight claimant could lift, how many hours she could sit or stand, or her capacity for other physical functions such as reaching, grasping, bending and stooping. Consequently, citing Berrios v. Secretary, 796 _______ _________ F.2d 574 (1st Cir. 1986) (Appeals Council, composed of lay persons, is not competent to interpret and apply raw, technical medical data), claimant argues that the ALJ impermissibly interpreted raw medical data to arrive at the conclusion that claimant could do sedentary work not requiring repeated fine manipulation or reaching above shoulder level. The ALJ did not impermissibly interpret raw medical data. While it is true that no doctor completed an RFC form, various doctors did indicate functional capacity in other forms. For example, in May 1988, Dr. Garcia executed a return to work certificate and did not place any limitation on the type of work. The same month, Dr. Acosta, the treating physician, projected claimant could return to work in July 1988, a date less than a year after claimant's alleged onset date of disability. See 20 C.F.R. 404.1505 ___ (to be eligible for benefits, the disabling impairment must last, or be expected to last, for a continuous period of at least 12 months). Claimant, too, described a fairly wide -8- range of activity she performed as of May 1988. She drove (in emergencies), cared for three children, and did household chores except ironing. From this evidence it was permissible to conclude, as the ALJ did, that claimant could handle some range of sedentary work. Even if claimant's conditions flared up or worsened some time after May 1988, nevertheless there is substantial evidence that claimant could perform sedentary work once again by November 1988. In his September 1988 report, Dr. Acosta stated claimant had very much improved. Although as of that date limitations in head flexion, arm movements, bending, and prolonged sitting prevented her from performing her secretarial job full time, Dr. Acosta believed claimant could begin part time work at a different, light job in two months. He stated that claimant should work "at first" part time, a phrasing which suggests he did not think claimant was permanently limited to part time work. Consequently, this is not a case where an ALJ had to interpret raw medical data to determine claimant's RFC. Rather, claimant's treating physician indicated in general terms what type of work (light duties) claimant could do despite her limitations. Claimant argues that the Secretary should have obtained a detailed assessment from a doctor specifically addressed to claimant's manual abilities and the effect fatigue produced by a full time job would have. In the context of this -9- record, we disagree. Dr. Acosta, the treating physician, filled out a form labelled "Attending Physician's Statement of Disability" to be submitted to claimant's employer's disability insurer. It was clear that this form would be used in assessing claimant's capacity for work, yet Dr. Acosta, while diagnosing bilateral thoracic outlet syndrome and noting limitations as of September 1988 in hand flexion, arm movements, bending, and prolonged sitting which prevented claimant from returning to her secretarial position, did not focus particularly on manual limitations. We do not think the Secretary was required to recruit a more detailed analysis than claimant's own treating physician had provided. B. Claimant contends the ALJ did not adequately consider and assess her complaints of pain and numbness and should have found a complete absence of bimanual dexterity rendering her unable to work. We disagree. The ALJ specifically followed Avery v. Secretary of Health and Human Services, 797 _____ ______________________________________ F.2d 19 (1st Cir. 1986), in assessing claimant's subjective complaints. He was not required to accept claimant's assertions, particularly in view of the treating physician's opinion that claimant could work and the treating physician's failure to focus on severe manual limitations precluding claimant from returning to work. C. -10- The ALJ did credit claimant's complaints in part and stated that claimant "should avoid the repeated use of hands for fine movements." He concluded that claimant could not return to her past secretarial job, but could do other jobs described by the ALJ. Claimant argues that she may not be able to perform the jobs the VE identified because the ALJ did not include the limitation in repeated fine movement in his question to the VE and hence the jobs the VE enumerated may require fine manipulation abilities. The ALJ posed the following question to the VE: Q If we determined that the claimant had or has the residual capacity to do sedentary jobs that would allow her to change positions and if she didn't have to use her hands or raise them higher than shoulders height, and that she weren't near unprotected heights or dangerous operating machinery, I ask you if she could do the job she did in the past, and if she couldn't if there is any jobs [sic] that she could perform. The VE responded that in the shoe industry claimant could either classify shoe parts or verify that labels had been properly cut and glued. In the electronics industry, she could be a tester, which would entail testing currents and electrical parts with capacitators. These jobs, the VE summed up, were sedentary, allowed for change of position, did not require reaching overhead, and did not expose the worker to dangerous heights. In other words, while the ALJ's question had included the broad condition that claimant not -11- have to "use" her hands, the VE's response did not include such an absolute limitation, but rather described jobs which apparently involved some use of the hands. The ALJ's second question to the ALJ added limitations. He asked the VE whether claimant could handle any job if her subjective complaints of pain and numbness were fully credited and if claimant "had a limitation from moderate to severe to utilize her hands in a sustained manner, for even sedentary tasks." The VE responded that there were no jobs claimant could perform. The fair thrust of the VE's testimony is that if claimant has a moderate to severe limitation in using her hands in a sustained manner, she can not perform the three jobs he listed, but if the restriction in use of her upper extremities is limited to overhead reaching, she can. The problem here is that claimant's functioning, as found by the ALJ, fell somewhere in between that posited in the two hypotheticals -- claimant could generally use her hands, but should not repeatedly perform fine movements -- but the VE was not asked, and did not directly say, what jobs claimant could handle if she were so restricted. We have indicated that the hypothetical posed to a VE must accurately reflect the claimant's limitation in order for the VE's response to constitute substantial evidence sustaining the Secretary's burden at step five to identify -12- alternate work the claimant can perform. Arocho v. Secretary ______ _________ of Health and Human Services, 670 F.2d 374 (1st Cir. 1982). _____________________________ See also Cooper v. Sullivan, 880 F.2d 1152, 1158 n.13 (9th ___ ____ ______ ________ Cir. 1989) ("A vocational expert's testimony can not constitute substantial evidence to support an ALJ's determination as to a claimant's disability status unless it accurately reflects all of the claimant's limitations ..."). Hence, the hypothetical was materially deficient in failing to include the limitation on fine manipulation. Particularly in view of claimant's repeated complaints of hand numbness and weakness, as well as the diagnosis of thoracic outlet syndrome -- a condition characterized by pain in the arms and weakness and wasting of the small muscles of the hand, Sloane-Dorland Annotated Medical Legal Dictionary 697 (1987) -- it was important for the VE to focus on claimant's manual abilities in identifying what jobs the claimant could perform. Not being vocational experts, we do not know whether the identified jobs require repeated fine movements. The Secretary argues, and the district court concluded, that claimant's failure to object to the phrasing of the hypothetical question or to elicit more information from the VE on cross-examination forecloses claimant from now claiming error. In support, the district court relied on Torres v. ______ Secretary of Health and Human Services, 870 F.2d 742 (1st ________________________________________ Cir. 1989). In Torres, claimant based disability on a visual ______ -13- complaint. The VE, who had reviewed the file, was asked whether claimant could perform his past work (as a waiter) or any other work in the national economy. On appeal, claimant argued that the question was inadequate because it did not specifically describe claimant's limitations. While noting that claimant's argument might be valid in general, we concluded that it was unavailing in the circumstances presented by that case where the record was limited, medical evidence was addressed substantially to one impairment (vision), all doctors had reported successful cataract surgery and good prognosis, and it was not likely that the VE would have failed to focus on the visual impairment in answering the question. In those circumstances, we stated that if claimant felt the hypothetical was inadequately phrased, he should have posed his own. The circumstances in the present case are very different. Multiple impairments with multiple alleged manifestations were claimed. The ALJ found a significant limitation on fine manipulative ability, but did not focus the ALJ's attention upon it. We think it is unrealistic to require the claimant to anticipate what complaints the ALJ will credit and what limitations the ALJ will find and to require the claimant to insure that the hyothetical reflects those limitations. -14- As the hypothetical did not include a significant limitation, we conclude that a remand is required so that a VE, properly informed of claimant's limitations, can determine whether there are jobs she can perform. The judgment of the district court is vacated and the case is remanded with directions to remand to the Secretary for further proceedings consistent with the opinion. -15-